# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-1339V
Filed: August 29, 2022
PUBLISHED

| | |
|---|---|
| DIANNA HEINER,<br><br>                  Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                  Respondent. | Special Master Horner<br><br>Table Injury; Shoulder Injury Related to Vaccine Administration ("SIRVA"); Influenza ("Flu") Vaccine; Ruling on Damages. |

*David Carney*, Green & Schafle, LLC, Philadelphia, PA, for petitioner.
*Voris Edward Johnson*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On September 3, 2019, petitioner Dianna Heiner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2018),[2] alleging that her September 11, 2018 influenza ("flu") vaccination caused a "shoulder injury related to vaccine administration" ("SIRVA"). (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is entitled to an award of compensation for a SIRVA and should be awarded $60,000.00.

### I.     Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make several factual demonstrations,

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

1

including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Finally—and the key question in most cases under the Program—the petitioner must also establish a causal link between the vaccination and the injury.  In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within 48 hours of administration of an influenza vaccine.  § 300aa-14(a) as amended by 42 CFR § 100.3.  Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provides more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table.  42 CFR § 100.3(c).  To be considered a "Table SIRVA," petitioner must show that his injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 CFR § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury or death was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005)

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence . . . ." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1).

In this case, petitioner contends that she suffered a left-sided shoulder injury meeting the criteria for demonstrating a SIRVA Table injury. (ECF No. 39, p. 19.) Petitioner notes that she may also theoretically prevail based on causation-in-fact (*Id*. at 14) but does not ultimately contend that she has satisfied the relevant *Althen* test for determining causation-in-fact. (*Id*. at 19). Respondent likewise contends petitioner has not provided evidence that would support a cause-in-fact claim. (ECF No. 40, p. 7.)

Compensation awarded pursuant to the Vaccine Act may include compensation for actual and projected pain and suffering, past and future unreimbursable medical expenses, and compensation for actual and anticipated loss of earnings. Section 15(a). Awards for actual and projected pain and suffering are "not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Here, petitioner requests an award of $90,000.00 in compensation for actual pain and suffering. (ECF No. 39, p. 1.)

## II.   Procedural History

This case was initially assigned to the Court's Special Processing Unit ("SPU"). (ECF No. 8.) Petitioner filed her petition, medical records, and statement of completion on September 3, 2019. (ECF Nos. 1, 6, 7.) Respondent completed his review of

petitioner's medical records on December 10, 2020, and requested that his Rule 4(c) Report deadline be suspended while the parties engaged in settlement discussions. (ECF No. 19.)

On March 19, 2021, petitioner filed a status report indicating that the parties had exchanged settlement proposals but ultimately "disagreed about various aspects of causation and damages," and had therefore reached an impasse in their negotiations. (ECF No. 22.) Respondent subsequently filed his Rule 4(c) report recommending against compensation on May 19, 2021. (ECF No. 25.) Specifically, respondent indicated that he did not believe that petitioner's records showed that she suffered injury within the 48-hour window established by the Vaccine Injury Table, and that the medical records did not otherwise establish preponderant evidence under a causation-in-fact theory. (*Id.* at 5-6.)

Petitioner subsequently filed affidavits from two of her former coworkers and a further statement of completion on August 3, 2021. (ECF Nos. 27, 28.) On September 8, 2021, respondent filed a status report indicating that he believed further factual development was necessary before the record was complete and ripe for a ruling on entitlement, specifically, respondent requested written interrogatories to petitioner's treating orthopedist and for the Court to schedule a fact hearing. (ECF No. 30.) Petitioner responded the same day in a status report arguing that the factual issues raised by respondent's status report were already addressed within her medical records, and that the interrogatories and fact hearing requested by respondent would be excessive and unnecessary. (ECF No. 31.) This case was then reassigned to my docket on September 10, 2021. (ECF No. 32.)

On September 22, 2021, I held a status conference during which the parties agreed to conduct a video deposition of petitioner and proceed to a fact hearing afterward if necessary. (ECF No. 34.) Respondent filed a transcript of the video deposition on December 3, 2021.[3] (ECF No. 36-1, Transcript of Proceedings ("Tr."), Nov. 2, 2021.) The parties subsequently filed a joint status report on December 3, 2021, agreeing that the record was sufficiently developed and requesting a ruling on the written record. (ECF No. 37.) The parties proposed to brief the issues of entitlement and damages simultaneously. (*Id*.)

Petitioner filed her motion for a ruling on the written record on December 8, 2021, contending she is entitled to $90,000.00 in compensation for a Table Injury of SIRVA. (ECF No. 39.) Respondent filed his response on January 5, 2022, contending that petitioner has not met her burden of establishing entitlement to compensation, but further indicating arguendo that compensation of $30,000.00 would be a more appropriate award of compensation for petitioner's pain and suffering given the facts and circumstances of the case. (ECF No. 40.) Petitioner filed her reply on January 12, 2022. (ECF No. 41.)

This case is now ripe for a ruling on the record.

---

[3] Respondent also filed a video of the deposition on December 9, 2021. (Dkt. Text 12/9/2021.)

### III.     Factual History

### a. As Reflected in the Medical Records

Prior to vaccination, petitioner's medical history was largely unremarkable. She suffered from hyperlipidemia and gastroesophageal reflux disease, but otherwise had no significant medical issues. (*See* Ex. 1, pp. 6-9, 11-18; Ex. 6.) She never reported any sort of shoulder pain before receiving the flu vaccine at issue. On September 11, 2018, petitioner received a flu vaccine in her left deltoid that serves as the basis for her claim. (Ex. 1, pp. 19-21.)

On February 18, 2019, roughly five months after her vaccination, petitioner reported to orthopedist Dr. Brian Snow with a complaint of left shoulder pain. (Ex. 3, pp. 8-10.) Petitioner described her pain as chronic, intermittent, progressively worse, and of an "aching, stabbing, shooting, [and] throbbing" nature. (*Id.* at 8.) Petitioner rated her pain severity as "moderate" and explained that it was aggravated with movement. (*Id.*) Petitioner reported that her pain began after she received her flu shot[4] and denied any other prior injuries to her left shoulder. (*Id.*) Dr. Snow's examination revealed tenderness at the bicipital groove with full range of motion and full strength. (*Id.* at 9.) Although Dr. Snow recorded full range of motion upon physical examination, petitioner reported that her "ROM is limited." (*Id.* at 8-9). Petitioner also showed positive O'Brien and speeds tests. (*Id.* at 9.) Petitioner received an X-ray at this visit, which revealed no fractures and mild acromioclavicular arthritis. (*Id.*) Dr. Snow assessed petitioner with generalized left shoulder pain and biceps tendinitis of the left shoulder. (*Id.*) He recommended that petitioner treat her pain with over-the-counter NSAIDs and begin a home exercise program before pursuing more aggressive treatments. (*Id.*)

On April 2, 2019, petitioner followed up with her primary care physician, Dr. Rhonda Hopkins, regarding her shoulder pain. (Ex. 1, pp. 22-25.) Dr. Hopkins noted an onset of "2 months ago." (*Id.* at 22.) Petitioner described her pain as aching, dull, and sharp and noted that there was no precipitating injury to explain her pain. (*Id.*) Petitioner further reported symptoms of decreased range of motion, joint tenderness, and sleep disturbances due to the pain and requested an orthopedic referral. (*Id.*) Petitioner reported that her pain was "relieved" by over-the-counter medications. (*Id.*) Dr. Hopkins's exam revealed severely reduced range of motion and joint tenderness. (*Id.* at 24.) Dr. Hopkins assessed petitioner with left shoulder pain and ordered physical therapy, a comprehensive metabolic panel, and tests for hypothyroidism and diabetes "since [they] can be causes for frozen shoulder." (*Id.*)

Petitioner began physical therapy at Edge Physical Therapy on April 9, 2019. (Ex. 4, p. 10.) Petitioner indicated that onset of her pain occurred on 9/12/2018 "after a flu shot." (*Id.*) She rated her pain 3/10 at best, 10/10 at worst, and at present a 5/10. (*Id.*) She continued to report that her pain was aggravated when reaching backward and raising her arm overhead. (*Id.*) Her disability index was rated as a 56 out of 100

---

[4] This record reports that petitioner received her flu shot on "10/2018" although her records indicate that it was in September 2018. (Ex. 3, p. 8.)

where 100 would be the most disabled and 0 would be not disabled at all.  (*Id.*)  Petitioner exhibited significantly reduced range of motion in her left shoulder with 120 degrees flexion, 35 degrees extension, 85 degrees abduction, 20 degrees adduction, 55 degrees internal rotation, and 50 degrees external rotation.  (*Id.* at 10-11.)  Petitioner was noted to have proximal weakness in the scapular stabilizers, and limited motor control due to pain and apprehension with moving her left shoulder.  (Ex. 4, p. 11.)  Petitioner's exam was indicative of inflammation and tendinitis.  (*Id.*)  Petitioner's physical therapist recommended she attend physical therapy one to two times per week for six to 12 weeks.  (*Id.*)  Petitioner attended three more physical therapy sessions on April 11, 16, and 23 of 2019.  (*Id.* at 17-22.)  It was noted that petitioner gradually improved session to session, but that her motor issues compensating for her shoulder pain had caused "postural faults" that required "skilled PT intervention" to resolve.  (*Id.* at 21.)  Petitioner did not submit any additional physical therapy records beyond April 23, 2019.

Following her physical therapy, petitioner returned to Dr. Snow on May 17, 2019.  (Ex. 3, pp. 5-7.)  She rated her pain as a 5/10 and explained that physical therapy had helped.  (*Id.* at 5.)  She continued to report aggravated pain when lifting, pushing, or pulling with her left shoulder, and again repeated that her pain began after her flu shot.  (*Id.*)  Petitioner's shoulder exam showed tenderness to palpation over her lateral acromion and bicipital groove.  (*Id.* at 5-6.)  Petitioner showed limited range of motion with 80 degrees abduction, 80 degrees forward flexion, and 60 degrees external rotation.  (*Id.* at 6.)  She had "essentially full" passive range of motion but reported pain at extremes.  (*Id.*)  Petitioner also showed signs of weakness in her supraspinatus.  (Ex. 3, p. 6.)  Dr. Snow discussed various treatment options with petitioner and ordered an MRI before determining how to move forward.  (*Id.*)

Petitioner returned to Dr. Snow to go over her MRI results on May 31, 2019.  (Ex. 3, pp. 2-4.)  Dr. Snow reported that petitioner's symptoms were unchanged since her last visit, recorded her pain as moderate to severe, and noted that "nothing has helped" address her pain.  (*Id.* at 2.)  Petitioner reported that her pain was a 9/10 at this visit, and her exam revealed tenderness to palpation over the lateral acromion and bicipital groove.  (*Id.* at 2-3.)  Petitioner's physical exam was unchanged from her previous visit to Dr. Snow.  (*Id.*; *see also id*. at 5-7.)  Dr. Snow noted that petitioner's MRI showed a 0.3 cm wide partial thickness tear (up to 25%) of the supraspinatus ligament, demonstrating proximal delamination and likely chronic in nature.  (*Id.* at 3; Ex. 5, pp. 1-2.)  The MRI also revealed mild bursal surface fraying of the supraspinatus, supraspinatus tendinopathy, mild infraspinatus and subscapularis tendinopathy, and trace subdeltoid and subacromial bursitis.  (*Id.*)  Dr. Snow assessed petitioner with a left rotator cuff tear and administered a steroid injection.  (*Id.* at 3.)

Petitioner did not submit any records documenting her treatment beyond May 31, 2019.

6

### b. As Reflected in Affidavits

#### i. Petitioner's Affidavit

Petitioner filed an affidavit on September 3, 2019.  (Ex. 2.)  Petitioner avers in her affidavit that she had "no orthopedic related issues in [her] left arm" prior to receiving her flu vaccine.  (*Id.* at 1.)  She states that she began to experience severe pain at the injection site "[i]mmediately upon the injection going into my left shoulder . . . ."  (*Id.* at 2.)  Petitioner further avers that her pain was "throbbing and unrelenting" in the following days, with her shoulder eventually feeling numb due to the pain.  (*Id.*)  Petitioner also states that her range of motion severely decreased within a week of receiving her vaccination.  (*Id.*)  Petitioner states that her pain began on the day of her vaccination at which point she began taking ibuprofen.  (*Id.*)  Petitioner explains that "[a]bout a month after [her] symptoms began, the severe pain in [her] left shoulder began to subside," to "deeper pain, tenderness and soreness in [her] left upper arm."  (*Id.*)

Petitioner explains that she postponed seeking treatment for her shoulder because her high deductible insurance made it too expensive.  (Ex. 2, p. 2.)  She also believed that her shoulder pain would resolve itself, and she was managing with her over the counter pain treatment.  (*Id.* at 2-3.)

Petitioner states that she also had issues and difficulties sleeping and moving her arm, often waking during the night due to her severe pain.  (Ex. 2, p. 3.)  Petitioner explained that she made multiple attempts to adjust her sleep posture to avoid triggering her shoulder pain during the night but that nothing helped.  (*Id.*)  By December 2018, she had had "little to no success" with her pain and sought an appointment with orthopedist, Dr. Snow.  (*Id.*)  Her first appointment with Dr. Snow was on February 18, 2019, where she was informed that she may have a frozen shoulder and chose to pursue a home exercise program instead of physical therapy to minimize her medical expenses.  (*Id.*)  Petitioner reported that by April 2019, her shoulder pain had become "so unbearable that [she] could not handle it anymore."  (*Id.* at 4.)  Importantly, petitioner explains that she told her doctor that her pain had "*worsen[ed]* over the previous two months," and that it was affecting her activities of daily living, range of motion, and sleep.  (*Id.*) (emphasis added).

Petitioner explains that she began physical therapy in April 2019 and attended several sessions with very minimal relief.  (Ex. 2, p. 4.)  Petitioner affirms that she returned to Dr. Snow and received an MRI in May 2019, at which point she received a cortisone injection.  (*Id.*)

At the time she drafted her affidavit, petitioner was unable to raise her arm above her head or reach backward without "severe, sharp, and excruciating pain."  (Ex. 2, p. 4.)  She was unable to dress herself and described having trouble with some aspects of daily life.  (*Id.*)  She continued treating her pain with over-the-counter NSAIDs.  (*Id.*)  Petitioner averred that since her shoulder pain began, she had to significantly reduce her involvement in the business that she and her husband operate due to her inability to

carry products, move shipping boxes, and set up displays at trade shows.  (*Id.* at 5.)  Petitioner also explains that prior to her flu shot she had started participating in marathons and triathlons.  (*Id.*)  However, upon injuring her shoulder, she was forced to stop training, and is currently unable to ride a bike, run, or swim.  (*Id.*)  As of the date this affidavit was prepared, petitioner was continuing to seek treatment and indicated that if she did not receive relief from planned steroid injections, the next step would be to undergo rotator cuff surgery.  (Ex. 2, p. 7.)

### ii. Affidavit of Corey Pearson

Petitioner also submitted an affidavit from her son and coworker Corey Pearson.  (Ex. 7.)  Mr. Pearson works as creative director for petitioner's company, Gammill Quilting Machine Dealership.  (*Id.* at 1.)  He recalls when petitioner received her flu shot because she did so at the same time every year to prepare for an annual international trade show that she would attend for her business.  (*Id.* at 1.)  Mr. Pearson recalls petitioner telling him that her shoulder was sore and painful during the week she received her vaccination.  (*Id.* at 2.)  He explains that he and petitioner would usually "only feel under the weather for a couple of days" after their vaccinations, but that petitioner complained of shoulder pain for weeks.  (*Id.*)  Mr. Pearson states that he underestimated the pain that petitioner was experiencing until the day of the tradeshow in October 2018.  (*Id.*)  He explains that petitioner was physically unable to help set up and told Mr. Pearson that her shoulder pain had become unbearable.  (Ex. 7, p. 2.)  Mr. Pearson states in his affidavit that petitioner's shoulder pain persisted after the trade show, and that she would mention her pain to him once or twice a week.  (*Id.*)  He corroborates petitioner's account of not being able to work due to her shoulder dysfunction through 2018 and 2019.  (*Id.*)  He indicates that he is unaware of any previous left shoulder injuries that petitioner may have suffered, and that many aspects of her life have been adversely impacted due to her shoulder pain.  (*Id.* at 2-3.)

### iii. Affidavit of Paula Fowles

Petitioner also submitted an affidavit from her former coworker Paula Fowles.  (Ex. 8.)  Ms. Fowles worked as a customer service representative for petitioner's company from March 2008 to December 2019.  (*Id.* at 1.)  Ms. Fowles affirms that she and petitioner were "quite close," and that they would see each other outside of work regularly.  (*Id.*)  Ms. Fowles recalls that petitioner would receive a flu vaccination before the international trade show that she attended each year.  (*Id.*)  Ms. Fowles notes that petitioner mentioned that her arm was sore and painful after her vaccination in September of 2018, and that petitioner mentioned the pain was worsening as the day went on.  (*Id.* at 2.)  Ms. Fowles states that from September to December 2018, she noticed petitioner struggling with her left shoulder and unable to perform tasks at work that she used to do without incident.  (*Id.*)  Ms. Fowles recalls reading an article about the flu vaccine causing SIRVAs on Facebook, and believed that this may be what happened to petitioner "as she thought that her shoulder pain was caused by the influenza vaccine from the day she got her vaccine."  (*Id.*)  Ms. Fowles affirms that she does not recall petitioner ever suffering any injury to her left shoulder before her

vaccination.  (*Id.* at 3.)  Ms. Fowles states that petitioner was very active prior to her injury, but that she is no longer able to swim and struggles to complete her activities of daily life due to her continuing shoulder pain.  (*Id.*)

### c.  As Reflected in Testimony

Petitioner also gave a deposition under oath on November 2, 2021.[5]  (ECF No. 36-1.)

Petitioner detailed her condition in the days following her vaccination, explaining that she immediately experienced "really painful, throbbing" pain for "about a week" after her vaccination, at which point "it just started going deeper where everything was hurting."  (*Id.* at 18.)  Petitioner further explained that her pain "changed location," which was when she "knew something was wrong, but [was not] sure what it was."  (*Id.*)  Petitioner stated that her pain began almost immediately after her vaccination, but that it went from local pain at the injection site to a deeper shoulder pain.  (*Id.* at 18-19.)  Because of her injury, petitioner "wasn't able to do anything at that point," explaining that she could not take care of basic housekeeping tasks and that it even disturbed her sleep as she struggled to find a sleeping position that did not cause her pain.  (*Id.* at 19.)  Additionally, petitioner was forced to stop exercising and training for triathlons because she could no longer swim or bike.  (*Id.* at 20.)  Petitioner stated that her shoulder pain did not improve "until probably the end of 2019, the beginning of 2020 where . . . [she] learned how to manage it."  (*Id.* at 21.)

Petitioner explained that she reached out for an appointment with orthopedist, Dr. Snow, in December of 2018 when she ran out of explanations as to why her shoulder pain persisted.  (Tr. at 21.)  She explained that up to that point, she had hoped to find a way to resolve her pain without professional medical attention because of the cost involved in seeking treatment.  (*Id.* at 22.) Specifically, petitioner indicated that she postponed treatment for her shoulder because at that time her insurance coverage had a deductible of $7,000.  (*Id.*  at 13-14.)

Petitioner noted that her pain was moderate to severe when she began treatment with Dr. Snow.  (*Id.* at 22-23.)  She quantified her pain as a 5/10 at rest, and as high as a 10/10 with movement.  (*Id.* at 23-24.)  In addition to her pain, petitioner confirmed that she also experienced "very restricted" range of motion, which she noted progressing around the month after she received her vaccination. (Tr. at 31.)  Petitioner indicated that after her May 2019 visit to Dr. Snow, she decided to forego any additional medical treatment and instead chose to manage her pain with home exercises and over the counter treatments.  (*Id.* at 25-26.)  She explained that she continues to manage her

---

[5] During her deposition, petitioner explained that her business has changed following her injury and that she had to drop a specific line of quilting machines from her sales due to her injury. (Tr. at 7-8.)  She confirmed that her salary did not change as a result of her injury (Tr. at 26), but suggested she intended to review with her attorney whether she would be making a claim for lost sales (Tr. at 27).  However, petitioner did not subsequently file any documentation to support an economic loss.  Nor did she assert any damages beyond pain and suffering in her motion for a ruling on the written record. (ECF Nos. 39, 41.)

pain with over-the-counter products, including NSAIDs and topical pain relief creams and patches.  (Tr. at 6.)

## IV.   Party Positions

### a. Petitioner's Contentions

#### i. On Causation

Petitioner contends that she has met the requirements for a Table SIRVA, focusing primarily on the question of onset.  (ECF No. 39, p. 14.)  First, she notes that her medical records and affidavits support a finding that she experienced shoulder pain within 48 hours of vaccination.  (*Id.* at 14-15.)  Specifically, she relies on multiple records from Dr. Snow, Dr. Hopkins, and her physical therapy provider.  (*Id.* at 15-16 (citing Ex. 1, pp. 22, 24; Ex. 3, pp. 3, 5-6, 8, 9; Ex. 4, p. 10).)  Petitioner also relies on affidavits of her son and former employee, arguing that both witnesses affirmed that petitioner described significant pain in her shoulder on the day of her vaccination.  (*Id.* at 16-17 (citing Exs. 7, 8).)  Finally, petitioner cites her own deposition, noting that it is further consistent with the affidavits filed in this case, and reasonably explains the minor ambiguities in the medical records as to the issue of onset.  (*Id.* at 17-18 (citing Tr. at 17-19).)  Petitioner explains that her delay in seeking treatment does not per se disprove her claim of immediate onset.  (ECF No. 41, p. 2.)  She argues that she consistently described her reason for delaying treatment as being an issue of cost and poor insurance coverage, opting to treat her pain with over-the-counter medication and behavioral changes instead of paying her high deductible to see an orthopedic specialist.  (*Id.* at 2-3 (citing Tr. at 13-14, 22, 24.)  Petitioner did not make any specific arguments regarding the remaining QAI criteria for establishing a Table SIRVA claim.  Nor did she present any argument as to why her medical records would support causation-in-fact.

#### ii. On Damages

In regard to her claim for damages, petitioner asks that I provide greater weight to her testimony and affidavits than her medical records.  (ECF No. 39, p. 19-22.)  Petitioner suggests that medical records are created in order to facilitate diagnosis and treatment but fail to account for the various factors that attribute to a petitioner's overall pain and suffering such as "losses of productivity at work, the enjoyment in personal pursuits, lost time with family, or the ability to live without depression that arises from these losses."  (*Id.* at 20 (citing *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993)).)  However, petitioner indicates the medical records should receive some weight insofar as they "buttress [p]etitioner's testimony . . . ."  (*Id.* at 21.)

Petitioner argues that pain and suffering awards must be determined upon considering the record as a whole, and that awards must not be made on a continuum, but rather determined independently, before applying the statutory damages cap.  (*Id.* at 22-23 (citing *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL

4072069, at *3 (Fed. Cl. Spec. Mstr. Jul 29, 2019); *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).)

In support of her claim for damages, petitioner cites several cases that she believes are consistent with her own.  She first cites *Young v. Secretary of Health & Human Services*, where a petitioner who suffered pain and reduced range of motion for six months received an award of $100,000.  No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).  Petitioner notes that like herself, the petitioner in *Young* also did not require surgery, treated their pain primarily with over-the-counter medication, and received a single steroid injection with limited physical therapy.  (ECF No. 39, pp. 24-25 (citing *Young*, 2019 WL 396981).)  The petitioner in *Cooper v. Secretary of Health & Human Services* suffered severe pain, sought a variety of alternative treatments, did not have surgery, and received $110,000.  No. 16-1387V, 2018 WL 6288181, at *3 (Fed. Cl. Spec. Mstr. Nov. 7, 2018).  In support of this award, the special master highlighted the eight-month duration of petitioner's initial severe pain and an extended period of residual pain with two years of physical therapy.  (ECF No. 39, p. 24 (citing *Young*, 2019 WL 396981).)  Petitioner next cites *Dhanoa v. Secretary of Health & Human Services* to strengthen her claim for damages, arguing that the petitioner experienced immediate onset, moderate initial pain that progressed to severe, with numerous physical therapy sessions and multiple steroid injections.  (ECF No. 39, p. 25 (citing No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).)  Petitioner notes that in *Dhanoa*, the impact on petitioner's ability to enjoy her hobbies and perform her work duties was also taken into consideration when awarding $85,000 for past pain and suffering and $10,000 for future pain and suffering.  (*Id.*)  Next, petitioner cites *Kent v. Secretary of Health & Human Services* where petitioner received an award of $80,000 based primarily on the five-month duration of severe pain and significant physical therapy.  (ECF No. 39, pp. 25-26 (citing No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019).)  Finally, petitioner cites *Weber v. Secretary of Health & Human Services*, where, although she never exhibited any reduced range of motion or weakness, the petitioner nonetheless experienced pain that "significantly disrupted her employment duties and ability to exercise."  (ECF No. 39 (citing No. 17-399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019).)

Petitioner also cites two cases which she argues should be viewed as "important floors for analyzing [petitioner's] case."  (ECF No. 39, pp. 26-27.)  The first case, resulting in an award of $60,000, involved a petitioner with relatively minor and brief pain that did not interfere with his work or activities of daily life.  (*Id.* (citing *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018).)  Petitioner also sought "intermittent" physical therapy which significantly improved his pain.  (*Id.*)  The second case that petitioner recommends the court use as a floor for analysis of her claim resulted in an award of $75,000 and involved severe pain.  (ECF No. 39, p. 27 (citing *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019).)  In support of the moderate award for pain and suffering, the special master indicated that petitioner's medical records indicated a mild injury that lasted between one and three months.  (*Id.*)

Petitioner argues that she suffered greater pain and suffering than the petitioners in *Pruett* and *Knauss*, and that her case is much more comparable to those of *Dhanoa*, *Cooper*, *Kent*, *Weber*, and *Young*. (ECF No. 39, p. 27.) She argues that her request for $90,000 in pain and suffering damages is reasonable due to her immediate severe pain, significantly decreased range of motion, substantial limitations on her ability to perform activities related to her work and hobbies, and continuing residual pain. (ECF No. 39, pp. 27-35.)

Finally, petitioner argues that the *Rayborn* decision, which respondent cites to argue in favor of a reduced award, is less consistent with her own than those cited above. First, petitioner notes that in *Rayborn*, the petitioner sought treatment after a month of waiting "to see if the discomfort would subside as it usually did." (ECF No. 41, p. 4 (citing *Rayborn v. Sec'y of Health & Human Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020).) Petitioner argues that her initial pain was more acute than the *Rayborn* petitioner's and that her medical records, particularly the MRI records, document a much more significant injury. (*Id.*) Petitioner stresses that these differences are some of the most significant factors used to distinguish SIRVA cases from one another, and therefore, her pain and suffering was ultimately more significant than the petitioner's in *Rayborn*, and consequently, she should receive damages in excess of the $55,000 awarded to the petitioner in that case. (*Id.*)

### b.  Respondent's Contentions

#### i.  On Causation

Respondent argues that petitioner has failed to show preponderant evidence that her injury occurred within 48 hours of her vaccination as required for a Table Injury of SIRVA. (ECF No. 40, p. 7.) Respondent stresses that although petitioner testifies that she experienced immediate pain upon receiving her vaccination, the fact that she postponed treatment for five months suggests that her pain in fact arose much later. Respondent notes that petitioner's explanation that expensive medical costs prevented her from seeking treatment is unpersuasive. Respondent explains that petitioner had seen her primary care physician three times for minor illnesses between receiving her vaccination and reporting her shoulder pain and argues that if petitioner was truly worried about the cost of her care, she would not have gone to her doctor for such minor issues. (*Id.*) Respondent further argues that if petitioner experienced severe shoulder pain like she testified to, "it is implausible" that she would have postponed treatment for so long. (*Id.*) For these reasons, respondent urges me to find that petitioner has failed to carry her burden of proving a Table SIRVA. (*Id.*)

#### ii.  On Damages

Respondent argues that petitioner overstates her pain and suffering, and that the totality of the evidence is more consistent with an award in the $30,000 range. (ECF No. 40, p. 13.) First, respondent argues that petitioner's delay in seeking treatment suggests particularly minor pain and suffering, especially considering that petitioner

sought treatment for minor conditions without mentioning her pain to her treating physician during that period.  (*Id.* at 10.)  Respondent also stresses petitioner's light course of physical therapy and singular cortisone shot as evidence that her injury required minimal treatment and thus is unlikely to have caused significant pain and suffering.  (*Id.*)  Based on petitioner's medical records, respondent notes that her overall course of treatment only lasted three and a half months.  (*Id.*)  Respondent also notes that petitioner changed her insurance plan to one featuring co-pays in Spring 2019, and thus, she cannot argue that she continued to decline treatment because of her high deductible.  (*Id.*)  On this point, respondent suggests that, because petitioner switched insurance plans, she should have been able to seek treatment with limited cost, and thus, if her pain persisted in such a severe manner, she would have done so.  (*See id.*)

Respondent cites several cases to argue that petitioner's claim is more consistent with SIRVA claims that received lower awards.  (ECF No. 40, pp. 10-11 (citing *Johnson v. Sec'y of Health & Human Servs.*, No 18-1486V, 2021 WL 836891, at *5 (Fed. Cl. Spec. Mstr. Jan. 25, 2021); *Smallwood v. Sec'y of Health & Human Servs.*, No. 18-0291V, 2020 WL 2954958, at *15 (Fed. Cl. Spec. Mstr. Apr. 29, 2020).  Respondent notes that he has never argued that fact testimony is inadmissible for the purpose of assessing damages, and even highlights the fact that testimony which is consistent with medical records is some of the most credible evidence available in the Vaccine Injury Program.  (ECF No. 40, p. 11.)  Respondent clarifies, however, that fact testimony which is inconsistent with the medical records, especially that offered by interested or possibly biased parties, may receive less weight than objective or corroborative fact testimony.  (*Id.*)

Respondent notes that *Pruett* is "readily distinguishable" because the petitioner sought treatment less than two weeks after being vaccinated, which indicates a much more severe level of pain and suffering.  (ECF No. 40, p. 12 (citing *Pruett*, 2019 WL 3297083 at *9).)  Respondent suggests that while *Knauss* is more consistent with petitioner's case than *Pruett*, it is still distinguishable in that the *Knauss* petitioner's treatment lasted for over a year, while this petitioner's lasted less than four months.  (ECF No. 40, p. 12 (citing *Knauss*, 2018 WL 3432906, at *2).)

Respondent believes that the *Rayborn* case is most consistent with petitioner's case.  (ECF No. 40, p. 12.)  First, respondent notes that over the course of eight months the *Rayborn* petitioner received one steroid shot and several rounds of physical therapy.  Their injury was minor, and their treatment lasted several months longer than petitioner's.  Based on the relatively minor injury, the *Rayborn* petitioner was awarded $55,000.  (*Id.* (citing *Rayborn*, 2020 WL 5522948 at *2-3).)  Respondent also directs my attention to *Mejias v. Secretary of Health & Human Services*, where the petitioner presented to the ER two days after his vaccination with such severe pain that he was unable to move his arm.  (ECF No. 40, p. 12 (citing No. 19-1944V, 2021 WL 5895622, at *3 (Fed. Cl. Spec. Mstr. Nov. 10, 2021).)  In *Mejias*, the petitioner reported to an orthopedist eight days later with a pain rating of 6/10 and was subsequently diagnosed with left shoulder capsulitis.  (*Id.*)  Respondent notes that in *Mejias*, the pain and suffering damages were only $45,000.  (*Id.*)  Respondent concludes his brief by urging

the undersigned to find that petitioner's case is much more in line with *Rayborn* and *Mejias*, and find that if she is entitled to compensation, her pain and suffering damages amount to $30,000.  (ECF No. 40, p. 13.)

### V.     Analysis

#### a.  Petitioner's SIRVA Claim

Petitioner has argued that she suffered a Table Injury of SIRVA and has not otherwise substantiated any cause-in-fact claim.  Respondent agrees that if petitioner meets the four QAI criteria for a Table SIRVA she would be entitled to a presumption of causation.  Further, if petitioner meets those criteria, respondent has not presented any factor unrelated to rebut that causal presumption.

With regard to the four SIRVA criteria, the parties dispute only the second—whether petitioner experienced an onset of shoulder pain within 48 hours of her vaccination.  The parties have raised no argument as to any of the other three criteria.  Additionally, my own review of the record confirms that petitioner had no history of pain, inflammation, or dysfunction of her left shoulder (satisfying criterion one), suffered post-vaccination pain and reduced range of motion that was confined to her left shoulder (satisfying criterion three), and suffered no other condition or abnormality that would explain her symptoms (satisfying criterion four).  Accordingly, if the records preponderantly support onset of new left shoulder pain within 48 hours of petitioner's September 11, 2018 flu vaccination, then she is entitled to compensation.

Based on the record as a whole, the evidence preponderates in favor of a finding that petitioner's onset of shoulder pain occurred within 48 hours of her September 11, 2018 flu vaccination.  In a deposition on November 2, 2021, petitioner testified under oath that she experienced immediate pain following her flu vaccination.  (Tr. at 18).  This testimony is supported by witness affidavits from petitioner's son and coworker, Mr. Pearson, and her former employee, Ms. Fowles, who both averred that petitioner began complaining of shoulder pain immediately after receiving the flu vaccine on September 11, 2018.  (Ex. 7, p. 2; Ex. 8, p. 2.)  Additionally, Dr. Snow's medical records and petitioner's physical therapy records support an onset of shoulder pain immediately following the flu vaccine.  (Ex. 3, p. 8; Ex. 4, p. 10.)

The only record inconsistent with an immediate onset following the flu vaccination is an April 2019 record from petitioner's primary care physician, Dr. Hopkins, that reported that petitioner's shoulder pain began two months prior.  (Ex. 1, p. 22.)  However, this record is contradicted by Dr. Snow's record from mid-February 2019 that associates the onset of petitioner's shoulder pain with receipt of her flu vaccination and documents her shoulder pain as being chronic.  (Ex. 3, p. 8.)  Given that a two-month duration of symptoms as of the April 2019 visit to Dr. Hopkins would place onset in early February, this record cannot be reconciled with contradictory records from Dr. Snow.  If petitioner's onset occurred in early February as the April 2019 record suggests, Dr. Snow would not have described petitioner's shoulder pain as chronic in

14

mid-February. Therefore, the contradictory record from April 2019 placing petitioner's onset in February 2019 does not outweigh petitioner's testimony, witness statements, records from Dr. Snow, and physical therapy records that support an immediate onset.

Respondent's argument that petitioner's onset could not have been immediate because petitioner did not seek treatment until February 2019, five months after vaccination, is not persuasive. The Vaccine Act instructs that the special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such a period." § 300aa-13(b)(2). Here, petitioner provides at least some explanation for the delay in seeking treatment—her reluctance to pay a high deductible to see a specialist as required by her insurance. (Ex. 2, p. 2; ECF No. 41, p. 2-3.) Even if petitioner's high deductible does not provide a complete explanation, a delay in seeking treatment does not *per se* defeat a claim for a Table Injury of SIRVA. *See, e.g., Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (noting that "there is no such thing as an 'appropriate' time to seek treatment"); *Smallwood*, 2020 WL 2954958, at *10 (noting that it is "common for a SIRVA petitioner to delay[] treatment, thinking his/her injury will resolve on its own."); *Williams v. Sec'y of Health & Human Servs.*, No. 17-1046V, 2020 WL 3579763 (Fed. Cl. Spec. Mstr. Apr. 1, 2020); *Gurney v. Sec'y of Health & Human Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Spec. Mstr. Mar. 19, 2019); *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied*, 142 Fed. Cl. 329 (2019); *Forman-Franco v. Sec'y of Health & Human Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018).

Accordingly, petitioner has preponderantly demonstrated that she suffered a Table Injury of SIRVA.

### b. Petitioner's Claim for Damages

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). However, for SIRVA claims—cases involving competent adults suffering only orthopedic injuries—awareness of the injury is generally not considered a significant factor. *See, e.g., Lawson v. Sec'y of Health & Human Servs.*, No. 18-882V, 2021 WL 688560, at *4 (Fed. Cl. Spec. Mstr. Jan. 5, 2021); *Welch v.*

*Sec'y of Health & Human Servs.*, No. 18-74V, 2021 WL 1795205, at *3 (Fed. Cl. Spec. Mstr. Apr. 5, 2021); *McDorman v. Sec'y of Health & Human Servs.*, No. 19-814V, 2021 WL 5504698, at *2 (Fed. Cl. Spec. Mstr. Oct. 18, 2021).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, while potentially persuasive, decisions regarding prior awards are not binding. *See Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."); *Nance v. Sec'y of Health & Human* Servs., No. 06–730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010).

The majority of SIRVA cases resolve within the Special Processing Unit or "SPU" which is overseen by the Chief Special Master. In a recently published decision awarding damages, the Chief Special Master explained as of July 2022 that 2,651 SIRVA cases had been compensated within the SPU since its inception in July 2014. *See Friberg v. Sec'y of Health & Human Servs.*, No. 19-1727V, 2022 WL 3152827, at *3 (Fed. Cl. Spec. Mstr. July 6, 2022). Among those cases, 114 were awarded compensation based on a reasoned decision of the special master. *Id*. Among the 114 decisions, the Chief Special Master has explained that the awards for actual pain and suffering have ranged from $40,000.00 to $210,000.00, with a median award of $100,000.00. *Id.* Additionally, I have issued one prior reasoned decision awarding damages in a SIRVA case. *See Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2022 WL 3681275 (Fed. Cl. Spec. Mstr. July 25, 2022).

Unsurprisingly, stipulated and proffered awards cover a much larger range—from $5,000 for the lowest stipulated amount to $1,845,047.00 for the highest proffered award. *Friberg*, 2022 WL 3152827, at *3. Of course, these amounts are not limited to pain and suffering awards. Moreover, as the Chief Special Master observed, "even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision." *Id*. (emphasis in original).

Here, the parties seek to triangulate the appropriate amount of damages by reference to eleven specific cases (petitioner cites seven and respondent four) with awards ranging from $45,000.00 to $110,000.00. Given that pain and suffering is inherently subjective, and given the number of variables involved in assessing each petitioner's medical history, direct comparison to other cases is very difficult. I am mindful of prior decisions regarding damages for SIRVA, including those cited by the

parties.  However, I do not rely on any one prior decision to determine the amount of petitioner's damages in this case.  Instead, I have reviewed previous SIRVA awards, the arguments presented by the parties, and the totality of the evidentiary record.  As noted above, the primary considerations informing pain and suffering in SIRVA cases is the severity and duration of the shoulder pain.  Numerous aspects of a petitioner's medical history potentially speak to these issues, including the total duration of the petitioner's pain, the total duration of any reduced range of motion, the length of time over which the petitioner actively treated the condition, the duration and outcome of any physical therapy, the modalities of treatment (*e.g.*, steroid injections, surgeries, etc.), the severity of MRI or surgical findings (if any), subjective reports of pain levels, and the ultimate prognosis.

Although not dispositive, petitioner's delay in seeking treatment supports a finding that petitioner's pain was relatively mild.  Prior cases have noted that a delay in seeking treatment, even while not necessarily informative regarding onset and entitlement, may nonetheless still be relevant to assessing the severity of pain and suffering.  *See Eshraghi v. Sec'y of Health & Human Servs.*, No. 19-39V, 2021 WL 2809590, at *3 (Fed. Cl. Spec. Mstr. June 4, 2021); *Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL 2224736, at *8 (Fed. Cl. Spec. Mstr. Mar. 26, 2018).  In this case, petitioner did not seek treatment for approximately five months.  (Ex. 3, pp. 8-10.)  Petitioner testified that she delayed seeking treatment "until it got bad enough that [she] really needed to see somebody."  (Tr. at 21.)  Similarly, the petitioner in *Rayborn* delayed seeking treatment for four months and instead treated herself with NSAIDs and restricted activity until her condition worsened.  *See Rayborn,* 2020 WL 5522948, at *11.

In addition to delaying her treatment, petitioner's medical records suggest that her treatment history was relatively short and mild.  When petitioner did seek care on February 18, 2019, she reported that her pain was chronic and intermittent and that it had gotten progressively worse.  (Ex. 3, p. 8.)  She described her pain severity as "moderate."  (*Id.*)  Based on Dr. Snow's examination, he recommended petitioner treat her shoulder with over-the-counter medications and begin a home exercise program rather than pursue more aggressive treatments.  (*Id.* at 9.)  When petitioner followed up with Dr. Hopkins two months later, petitioner reported that she continued to experience pain and sleep disturbances, but that her pain was relieved by over-the-counter medications.  (Ex. 1, p. 22.)  At petitioner's first physical therapy session, she rated her pain as 3/10 at best, 10/10 at worst, and 5/10 at the time of the visit.  (Ex. 4, p. 10.)  Petitioner attended four physical therapy sessions and showed gradual improvement at each session.  (*Id.* at 17-22.)  At a follow-up visit to Dr. Snow on May 17, 2019, petitioner reported improvement with physical therapy and rated her pain as a 5/10.[6] (Ex. 3, p. 5.)  Petitioner confirmed that she has not seen a doctor for her shoulder pain since May 2019.  (Tr. 25.)  Overall, petitioner's descriptions of moderate pain, the fact that she was able to manage her pain at least in part with over-the-counter medications, her decision to discontinue physical therapy after only four sessions, and her relatively

---

[6] However, on May 31, 2019, petitioner rated her pain as 9/10 and noted that her condition had not changed.  (Ex. 3, pp. 2-3.)

short treatment course from February 2019 to May 2019 suggest that petitioner's shoulder pain was mild to moderate for a SIRVA injury.

However, despite petitioner's relatively short and mild treatment course and delay in seeking treatment beyond what is specifically reflected in the medical records, the record also reveals that petitioner's injury interfered with her activities of daily life, most notably in the form of disruption to her business due to her injury and her inability to continue participating in marathons and triathlons.  Petitioner attested that since her shoulder pain began, she had to substantially limit her involvement in her business due to her inability to carry products, move shipping boxes, and set up displays at trade shows.  (Ex. 2, p. 5.)  In *Dillenbeck*, the petitioner's inability to continue working as a vet tech factored into the pain and suffering calculation.  *Dillenbeck,* 2019 WL 4072069, at *14.  Additionally, in *Marino*, the petitioner's ability to perform her usual job duties as a nurse practitioner, including lifting and repositioning patients, was negatively impacted by her shoulder injury.  *Marino,* 2018 WL 2224736, at *8.  In this case, although petitioner was able to continue working, her shoulder injury caused a disruption to her business and negatively impacted her ability to perform the physical tasks she previously performed at her job.

Based on the record as a whole, I conclude that $60,000.00 represents a reasonable award for petitioner's pain and suffering.

## VI.     Conclusion

After weighing the evidence of record within the context of this Program, I find by preponderant evidence that petitioner suffered a Table Injury of SIRVA following her September 11, 2018 flu vaccination.  Accordingly, petitioner is entitled to an award of compensation.  Further, I find that $60,000.00 represents a reasonable and appropriate award for petitioner's past pain and suffering.

**I thus award Petitioner a lump sum payment of $60,000.00, representing compensation for actual pain and suffering in the form of a check payable to petitioner.**  This amount represents compensation for all damages available under Section 15(a).  The Clerk of the Court is directed to enter judgment in accordance with this decision.[7]

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.